**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 26-90739 (ARP) |
| HUGHES SATELLITE SYSTEMS CORPORATION, *et al.*,[1] | ) | (Jointly Administered) |
| Debtors. | ) | |

# NOTEHOLDER GROUP'S EMERGENCY MOTION TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO 11 U.S.C. § 1121(d)(1)

**Emergency relief has been requested. A hearing will be conducted on this matter on September 28, 2026 at 4:00 p.m. (prevailing Central time).**

**To the extent that you have received notice, if you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on September 28, 2026 at 4:00 p.m. (prevailing Central time) in courtroom 400, 515 Rusk, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Alfredo R. Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's home page. Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "electronic appearance" link on Judge Perez's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

---

[1] The last four digits of Hughes Satellite Systems Corporation's tax identification number are 7865. A complete list of each of the Debtors in these Chapter 11 Cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/HughesSatellite. The location of the Debtors' corporate headquarters and the Debtors' service address is 9601 S. Meridian Blvd., Englewood, Colorado 80112.

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

BASIS FOR EMERGENCY RELIEF .............................................................................. 5

STATEMENT OF FACTS ............................................................................................. 6

A. The Debtors And Their Capital Structure ................................................................ 6

B. The Debtors' Deteriorating Financial Condition ...................................................... 7

C. The Failure To Negotiate And The Structural Conflict ............................................ 8

D. The Noteholder Group's Confirmable Plan ............................................................ 10

LEGAL STANDARD .................................................................................................. 13

ARGUMENT .............................................................................................................. 14

I. ALL NINE *EXPRESS ONE* FACTORS FAVOR TERMINATION OF THE EXCLUSIVITY PERIODS ........................................................................................ 14

A. Payment Of Bills As They Become Due—The Debtors Approaching Cash Crisis ..... 14

B. Good Faith Progress Toward Reorganization—None Exists ................................... 17

C. Reasonable Prospects For Filing A Viable Plan—There Are None ......................... 19

D. Use Of Exclusivity As Leverage—EchoStar, Ergen, and his associates Benefit From Delay ..... 21

E. Progress In Negotiations With Creditors—Zero ..................................................... 24

F. Sufficient Time To Negotiate—The Debtors Have Had More Than Enough ........... 25

G. Unresolved Contingency—The Absence Of Funding Is Fatal ................................. 28

H. Size And Complexity—This Is A Straightforward Bankruptcy ............................... 29

I. Time Elapsed—Every Day Costs Creditors Money ................................................. 31

J. Termination Will Move This Case Forward ............................................................ 33

PRAYER FOR RELIEF ............................................................................................... 34

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ellis v. Westinghouse Elec. Co.*,
LLC, 11 F.4th 221 (3d Cir. 2021) .......... 17

*H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*,
2011 WL 2261483 (D. Md. June 3, 2011) .......... 33

*In re Adelphia Commc'ns Corp.*,
352 B.R. 578 (Bankr. S.D.N.Y. 2006) .......... 18

*In re Dow Corning Corp.*,
208 B.R. 661 (Bankr. E.D. Mich. 1997) .......... passim

*In re Express One Int'l, Inc.*,
194 B.R. 98 (Bankr. E.D. Tex. 1996) .......... passim

*In re Gen. Bearing Corp.*,
136 B.R. 361 (Bankr. S.D.N.Y. 1992) .......... 22, 30

*In re GMG Capital Partners III, L.P.*,
503 B.R. 596 (Bankr. S.D.N.Y. 2014) .......... 15, 24, 28

*In re Grossinger's Associates*,
116 B.R. 34 (Bankr. S.D.N.Y. 1990) .......... 15

*In re Nats.*,
669 B.R. 326 (Bankr. C.D. Cal. 2025) .......... 18, 30

*In re Proppant Tech Services, LLC*,
No. 23-50734-MMP (Bankr. W.D. Tex. Sept. 9, 2023) .......... 18, 31

*In re R.G. Pharmacy, Inc.*,
374 B.R. 484 (Bankr. D. Conn. 2007) .......... 28

*In re Sw. Oil Co. of Jourdanton, Inc.*,
84 B.R. 448 (Bankr. W.D. Tex. 1987) .......... 29, 33

*In re TMT Procurement Corp.*,
534 B.R. 912 (Bankr. S.D. Tex. 2015) .......... 17

*Matter of Lake in the Woods*,
10 B.R. 338 (E.D. Mich. 1981) ....................21

**STATUTES**

11 U.S.C. § 1112(b) ....................17

11 U.S.C. § 1121(b) ....................34

11 U.S.C. § 1121(c)(3) ....................34

11 U.S.C. § 1121 (d) ....................30

11 U.S.C. § 1121(d)(1) ....................2, 13

11 U.S.C. § 1129(a)(11) ....................20

11 U.S.C. § 365(d)(5) ....................26

The Noteholder Group[2] moves this Court pursuant to 11 U.S.C. § 1121(d)(1) for entry of an order terminating the exclusive periods of Hughes Satellite Systems Corporation ("Hughes") and its debtor affiliates (collectively, the "Debtors") to file plans of reorganization and solicit acceptances thereof. In the alternative, the Noteholder Group requests that the exclusivity periods be modified to permit the Noteholder Group to file plans of reorganization for the Debtors and solicit acceptances of such plans.

## PRELIMINARY STATEMENT

1. This case presents extraordinary facts requiring immediate termination of the Debtors' exclusivity periods. The Debtors—controlled by EchoStar Corporation ("EchoStar") and its Chairman Charles W. Ergen, who exercises approximately 90.4% voting control over EchoStar (Dkt. 93 ¶ 3)—owe approximately $1.5 billion to holders of the Senior Secured Notes and the Senior Unsecured Notes and additional albeit much smaller amounts to trade creditors. Of this debt, the Noteholder Group collectively holds more than 61.6% of the outstanding principal of the $750 million 5.25% Senior Secured Notes and more than 84.37% of the outstanding $750 million 6.625% Senior Notes. *See* Dkt. 93 ¶ 2. The Noteholder Group's claims vastly exceed the debt held by all other creditors in these cases combined. Dkt. 41 ¶ 2.

2. [redacted]

[2] The Noteholder Group consists of those institutions listed on Exhibit A of the *Verified Statement of Noteholders Pursuant to Bankruptcy Rule 2019* [Dkt. 154].

[redacted]

3. [redacted] Only days ago, the Debtors filed a motion to commence payments to professionals whose administrative claims are (a) junior and subordinate to the super-priority claims of secured creditors who suffer the depletion of cash collateral and (b) *pari passu* with all other administrative claims. *See Debtors' Mot. for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*, filed September 1, 2026, Dkt. 295.

4. The Debtors also say that they are working on a new business plan, but the Debtors have not shared any information about whether that new plan can be expected to show different results than the projections that the Debtors' professionals have sworn are their "best guess" about the future. [redacted]

5. This situation cries out for the prompt proposal and confirmation of a plan of reorganization. Genuine fiduciaries would do everything in their power to confront this urgent

situation constructively and in the interests of creditors. The Special Committee appears to agree with this assessment. In addition, Patrick Nash of Kirkland & Ellis advised the court: "From the Special Committee's perspective, Judge, we think that we should be mediating the entire case," and that "mediation, if parties are reasonable, has a huge chance of being successful." Sept. 3, 2026 Hr'g Tr. at 6:13-15; 7:6-7. Yet the parties are no closer to beginning mediation—an ideal forum for discussions about a plan of reorganization—than they were at that September 3 hearing. At this point in time, there is no agreement on a mediator. There is only an agreement to continue discussions about who should be the mediator and only after that to discuss the scope and conduct of the mediation. The Debtors have requested that there should be a pause on litigation during the mediation. As evidenced by this Motion, that request was rejected.

6. During this paralysis, the Noteholder Group has formulated a plan that thoroughly addresses the Debtors' troubled circumstances and that it believes will be accepted by all classes of creditors. The Noteholder Group is also willing to provide DIP financing to allow the Debtors to operate through the plan confirmation process. Notwithstanding these efforts, the Noteholder Group cannot advance these cases without the assistance of this Court because the Noteholder Group is currently precluded from proposing a plan of reorganization.

7. The structural conflict at the heart of this case makes continued exclusivity not merely unwarranted but affirmatively harmful. EchoStar controls the Debtors, yet the estate holds claims in excess of $1.5 billion against EchoStar—claims that the Noteholder Group, not the Debtors, identified and preserved. It is also unclear who actually has the exclusive right to file plans of reorganization for the Debtors. Is it the Hughes Board of Directors? The Special Committee? EchoStar as the controlling shareholder of Hughes? Is it Charles Ergen who controls or has appointed all of the individuals that have any responsible positions at Hughes and EchoStar

or is it some kind of alliance of all of them? All of these parties benefit from the exclusive periods, and none has made any progress towards the negotiation of a plan of reorganization. Indeed, they have not even proposed, much less secured, financing for the duration of the chapter 11 cases and a plan process. And the resulting paralysis serves no one except EchoStar, which benefits from every day of delay as estate resources are consumed and efforts to recover from it are delayed.

8. The exclusivity provisions of Section 1121 were never intended to serve as a shield behind which conflicted debtors may park themselves in Chapter 11 while estate resources are depleted and creditor recoveries diminish with each passing day. As the Fifth Circuit admonished in *In re Timbers of Inwood Forest Assocs., Ltd.*, Section 1121 "was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." 808 F.2d 363, 372 (5th Cir. 1987). That warning has particular force here, [redacted] and have no identified source of exit financing—yet seek to maintain the exclusive privilege of proposing a plan.

9. The Noteholder Group has formulated a joint plan of reorganization for all of the Debtors (the "Plan") that will preserve value for all stakeholders [redacted] That Plan is outlined in the term sheet attached hereto as Exhibit B (the "Plan Term Sheet"). The Plan Term Sheet provides for a post-reorganization sale process that will either validate an assumed plan valuation or result in adjustments to reflect the market outcome. If the sale process fails, the Plan's stand-alone reorganization provisions will remain in effect, assuring that no matter the outcome of the sale process, Hughes will be permitted to thrive. The Plan is straightforward, it will likely be accepted by every creditor class in these

cases, it is confirmable (whether or not it is accepted by EchoStar, the Debtors' sole shareholder), and it respects the priorities of the Bankruptcy Code.

10. The presentation of a viable and confirmable plan in the face of the Debtors' [redacted], and consideration of every relevant factor favor termination of exclusivity.

**BASIS FOR EMERGENCY RELIEF**

11. The need for emergency relief is driven by [redacted]

12. [redacted]

13. The ordinary-course schedule for hearing a motion to terminate plan and solicitation exclusivity cannot accommodate this timeline. The standard 120-day exclusivity period is not scheduled to expire until late November or early December 2026, [redacted] The Noteholder Group has a fully formulated plan ready to file within five business days following an order permitting them to file a plan. And as promptly as possible following any such order, one or more members of the Noteholder Group will propose bridge DIP financing, that would provide a path to confirmation of the Plan. The Court should hear this Motion on shortened notice on September 28, 2026 as waiting longer would risk irreparable harm from further depletion of estate resources.

## STATEMENT OF FACTS

### A. The Debtors And Their Capital Structure

14. Hughes is a wholly-owned subsidiary of EchoStar Corporation, a publicly traded company controlled by Charles W. Ergen, who exercises approximately 90.4% of EchoStar's voting power. Dkt. 93 ¶ 3. The 12 debtor entities in these cases are all wholly-owned subsidiaries of Hughes. Dkt. 4 ¶ 27.

15. The Debtors' funded debt includes two tranches of notes—$750 million in 5.25% Senior Secured Notes and $750 million in 6.625% Senior Notes—plus a $50 million intercompany secured loan from EchoStar XXIV. Dkt. 4 ¶¶ 29–32. Both tranches of notes matured on August 1, 2026. The Debtors did not pay them.

16. On August 2, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. Dkt. 1. Robert Del Genio of FTI Consulting serves as the Debtors' Chief Restructuring Officer. Dkt. 4 ¶ 1.

**B. The Debtors' Deteriorating Financial Condition**

17. The Debtors are already accruing and not paying current administrative expenses and [redacted].

18. On August 19, 2026, the Noteholder Group deposed the Debtors' Chief Restructuring Officer, Robert Del Genio of FTI Consulting, as the Debtors' designated Rule 30(b)(6) representative. [redacted]

19. [redacted]

[redacted] Under the last cash collateral order the Debtors are required to share DIP financing proposals with the Noteholder Group. None have been received.

20. The Debtors' current cash crisis is the direct and foreseeable (and likely actually foreseen) result of EchoStar's extraction of value from Hughes. In the first quarter of 2024 alone, Hughes distributed over $1 billion in dividends to EchoStar—$529 million on February 15, 2024, followed by an additional $500 million on March 12, 2024. *Hughes Satellite Systems Corporation, Annual Report (Form 10-K) for the Fiscal Year Ended December 31, 2024*, at 35. Dkt. 224-6. Hughes paid these dividends while it faced a known $1.5 billion maturity in August 2026. The Debtors' cash position did not deteriorate organically—it was deliberately drained by the very parent and controlling shareholder that now exercises exclusive control over the reorganization process.

21. Compounding this, EchoStar has disclaimed any responsibility for funding the Debtors' obligations. Hughes's own filings acknowledge that EchoStar cannot be counted on to assist Hughes in paying its debts. Dkt. 4 ¶ 42; Dkt. 42-4 at 39. No alternative source of exit financing has been identified by the Debtors.

**C. The Failure To Negotiate And The Structural Conflict**

22. The Debtors have not engaged in any plan negotiations with the Noteholder Group since the Petition Date. Instead, the Debtors have said that they have directed estate resources toward a Special Committee investigation—an investigation conducted by directors appointed by the very insider, Charles Ergen, whose conduct is at issue. Dkt. 4 ¶¶ 49–50. They have not

articulated any timeline for proposing or even discussing a plan. Their only stated objectives—to "right-size their capital structure" and "restructure their business"—are platitudes, not a plan. *Id.* ¶ 35.

23. The structural conflict leads to paralysis. EchoStar—really Mr. Ergen—controls the Debtors' boards and management. Yet the estate holds claims in excess of $1.5 billion against EchoStar—claims arising from years of asset-stripping and mismanagement that the Noteholder Group identified and preserved when it intervened to prevent the DISH DBS plan from releasing all claims against EchoStar without creditor consent. Dkt. 93 ¶¶ 4, 26–27. A debtor controlled by the very entity against whom it must prosecute its largest claims cannot, in any meaningful sense, be expected to act as a genuine fiduciary to the estate.

24. The structural conflict is not theoretical—it manifests in the specific insider transactions that have depleted the estate. [redacted]

25. The same pattern recurs with the $50 million "financing agreement" between Hughes and EchoStar XXIV. [redacted]

[redacted]

**D. The Noteholder Group's Confirmable Plan**

26. The Noteholder Group has prepared a detailed Plan Term Sheet setting forth the principal terms of a confirmable Plan for the Debtors. Below is a high level summary of the terms of the Plan.[3]

| | |
|---|---|
| **Plan Overview** | The Plan contemplates a standalone debt-for-equity reorganization with a litigation trust. The Plan also provides for a sale process (the "Sale Process") to be conducted immediately following the Effective Date of the Plan. If the Sale Process does not yield a result satisfactory to the post-reorganization board of directors (the "Post-Reorganization Board"), a debt-for-equity standalone reorganization of the Debtors will remain in place subject to an appraisal. If the Sale Process results in a bid that is acceptable to the Post-Reorganization Board (the "Final Bid"), then Reorganized Hughes shall implement the Sale Transaction proposed by the Successful Bidder (a "Sale Event"). |
| **Exit Capital Structure** | The post-emergence capital structure consists of four components:<br>• a New ABL Facility (senior secured asset-based revolver for Plan distributions and working capital);<br>• a refinancing of the Bridge DIP Loan; |

[3] This summary of the Plan and the Plan Term Sheet is qualified in its entirety by the Plan Term Sheet itself. To the extent of any conflict or inconsistency between this summary and the Plan Term Sheet, the Plan Term Sheet governs the proposed terms of the Plan. Capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to such terms in the Plan Term Sheet.

| | |
|---|---|
| | • New Secured Debt in a principal amount to be determined; and<br>• Reorganized Hughes Equity to be issued to holders of Senior Secured Notes, subject to dilution by a Post-Emergence Equity Incentive Program. |
| **Treatment of Claims** | The Plan establishes the following classification and treatment of claims:<br>• Super-priority claims under § 507(b) receive first-dollar recovery from Retained Causes of Action after Litigation Trust expenses, to the extent not paid in cash on the Effective Date.<br>• Bridge DIP Loan Claims retain their liens and accrue interest until paid in full.<br>• Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims receive payment in full, reinstatement, collateral delivery, or otherwise unimpaired at the election of the Required Noteholders.<br>• All Asset Secured Claims include Senior Secured Notes Claims and the EchoStar J3 Secured Advance Claim, totaling approximately $800 million in outstanding principal amount. The Allowed Unaffiliated Secured Notes Claim shall be tentatively Allowed in the amount of [$300–600 million],[4] and shall receive *pro rata* distributions of Reorganized Hughes Equity and New Secured Debt. The EchoStar J3 Secured Advance Claim and $123 million in affiliated Senior Secured Notes are disputed and subject to disallowance and equitable subordination.<br>• Other Unsecured Claims (including Unsecured Senior Notes Claims Allowed at approximately $774.8 million and Secured Notes Deficiency Claims) receive distributions through the Litigation Trust.<br>• If the aggregate amount of Allowed Unsecured Trade Claims is less than or equal to the Trade Claim Cap Unsecured Trade Claims will be unimpaired. If the aggregate amount of Allowed Unsecured Trade Claims exceeds the Trade Claim Cap, then each Allowed |

[4] This is a preliminary range that has been calculated with the very little information that is publicly available and without the benefit of information and diligence desired, requested, and required for a full valuation of the Debtors' business or assets. Moreover, the identification of a range does not suggest that the mid-point of the range is the appropriate valuation. In fact, actual value may be at the bottom of or even below the range that is identified.

| | |
|---|---|
| | Unsecured Trade Claim shall receive its *pro rata* share of the Trade Claim Distribution. In all events, treatment of Allowed Unsecured Trade Claims shall be more favorable than the treatment of Other Unsecured Claims.<br>• EchoStar's equity interests receive the distributions specified in the Litigation Trust Agreement. |
| **Litigation Trust** | The Plan establishes a Litigation Trust to pursue Retained Causes of Action against EchoStar and its affiliates and directors and officers of the Debtors. The Litigation Trust will be administered by a trustee selected by the Required Noteholders and governed by a Litigation Trust Advisory Board. The Litigation Trust waterfall distributes proceeds first to trust expenses, then to super-priority claims, then to Allowed Other Unsecured Claims, then to Subordinated Claims, and finally to holders of Interests in Hughes — each tier receiving interest at 13.75% from the Effective Date. |
| **Key Implementation Terms** | • J3 Satellite Lease: Rejected on the Effective Date unless EchoStar XXIV agrees to modifications acceptable to the Required Noteholders.<br>• Executory Contracts: All executory contracts and unexpired leases (other than the J3 Satellite Lease) are deemed assumed unless previously rejected or designated for rejection.<br>• Milestones: The Plan, Disclosure Statement, and approval motion must be filed within 20 days of agreement; Disclosure Statement approval within 40 days of filing; confirmation within 30 days of Disclosure Statement approval; and the Sale Process is designed to close within one year of the Effective Date.<br>• Conditions Precedent: The Effective Date is conditioned on, among other things, entry into the New ABL Facility and New Secured Debt, issuance of Reorganized Hughes Equity, payment of Noteholder Group Professional Fees, receipt of a PLR or Tax Opinion, and obtaining all requisite FCC and regulatory approvals. |
| **Governance and Releases** | The Post-Reorganization Board will consist of five members selected by the Required Noteholders. The Plan terminates all prepetition indemnification provisions for directors, officers, and other professionals, with any resulting claims classified as Other Unsecured Claims or Subordinated Unsecured Claims.<br>The Plan contains exculpation provisions limited to the Official Committee of Unsecured Creditors and the Noteholder Group |

| | |
|---|---|
| | (with conditional extension to certain Special Committee members).<br>The Plan does not contemplate the release of any claims owned by any Debtor or any third-party releases. |

**LEGAL STANDARD**

27. Section 1121(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest . . . and after notice and a hearing, the court may for cause . . . reduce the [exclusive] period . . .." 11 U.S.C. § 1121(d)(1). Courts in this Circuit and elsewhere apply the nine-factor test articulated in *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996), and refined in *In re Dow Corning Corp.*, 208 B.R. 661, 664–65 (Bankr. E.D. Mich. 1997). The factors are:

(1) whether the debtor is paying its bills as they become due;
(2) the existence of good faith progress toward reorganization;
(3) whether the debtor has demonstrated reasonable prospects for filing a viable plan;
(4) whether the debtor is seeking to use exclusivity as a negotiating tool to force acceptance of a plan that is unacceptable;

(5) whether the debtor has made progress in negotiations with its creditors;
(6) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
(7) whether an unresolved contingency exists;
(8) the size and complexity of the case; and
(9) the amount of time which has elapsed in the case.

28. As the *Dow Corning* court emphasized, "the primary consideration should be whether or not [terminating exclusivity] would facilitate moving the case forward." 208 B.R. at 670.

## ARGUMENT

### I. ALL NINE *EXPRESS ONE* FACTORS FAVOR TERMINATION OF THE EXCLUSIVITY PERIODS

### A. Payment Of Bills As They Become Due—The Debtors Approaching Cash Crisis

29. The most urgent consideration here is whether the Debtors can pay their bills as they become due—[redacted], this factor also points to termination of exclusivity. The filing of a plan, obtaining approval of a disclosure statement, solicitation of acceptances and a confirmation trial (likely necessary in this case only if EchoStar objects to confirmation of the Plan) will require several months to complete. [redacted]

30. [redacted]

31. Moreover, the Debtors here are incurring expenses that they are not yet obligated to pay, but will be obligated to pay and they have no means to make those payments as and when these obligations become due. One such obligation is the requirement to pay the fair use value for the Jupiter 3 satellite (if the lease is rejected) or the full rental payment that was deferred in August and September (if the lease is assumed). Other obligations relate to the millions of dollars of professional fees sought by the many professionals proposed to be engaged in this case. Astoundingly, the Debtors filed a motion to allow professionals to bill and collect fees and costs even though there is no money available to pay any of them and there exist other equal or higher priority claims that cannot be paid currently. Accruing administrative expenses is not the same as paying bills as they become due.

32. In *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 601 (Bankr. S.D.N.Y. 2014), the court found that this factor weighed against the debtor because it was "not paying its bills as they became due, and is hurtling deeper into insolvency. It continues to accrue professional fees" it could not fund. Likewise, in *In re Grossinger's Associates*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990), the court terminated exclusivity because the debtor "ha[d] not satisfied the funding of accruing administrative expenses as a condition for continued plan exclusivity" and was "simply bidding for more time because it does not have any funding in place to support a plan." As discussed below, [redacted]

[redacted].

33. [redacted]

34. [redacted]

35. [redacted]

36. The strength of this factor is further confirmed by analogy to caselaw interpreting 11 U.S.C. § 1112(b). It is well established that "inability to pay administrative expenses"—termed administrative insolvency—"typically result[s] in conversion of the Chapter 11 case to Chapter 7 liquidation." *Ellis v. Westinghouse Elec. Co.*, LLC, 11 F.4th 221, 234 (3d Cir. 2021). This Court's own precedent confirms that negative cash flow alone may warrant conversion to a Chapter 7 liquidation. *See In re TMT Procurement Corp.*, 534 B.R. 912, 931 (Bankr. S.D. Tex. 2015). If a debtor's financial condition warrants the drastic remedy of mandatory conversion to Chapter 7, it is *a fortiori* sufficient to warrant the far lesser remedy of terminating exclusivity and permitting competing plans. Hughes was unable to pay its funded debt prepetition and remains unable to do so post-petition. Its parent has disclaimed any obligation to provide funding. [redacted] No reasonable mind could conclude that maintaining exclusivity will somehow conjure the financing that neither the capital markets nor Hughes's own parent have been willing to provide. Terminating exclusivity is warranted.

**B. Good Faith Progress Toward Reorganization—None Exists**

37. The court also examines whether the debtor has demonstrated "the existence of good faith progress toward reorganization." *Dow Corning*, 208 B.R. at 664. This factor is "one of the more important factors" in the exclusivity analysis. *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 588 (Bankr. S.D.N.Y. 2006). Here, it weighs decisively in favor of termination.

38. Good faith progress toward reorganization demands demonstrable forward movement toward emergence from Chapter 11. A debtor must show that it is actively and genuinely working toward proposing a confirmable plan, negotiating with creditors, and taking concrete steps to resolve the fundamental issues that brought it into bankruptcy. *See In re Nats.*,

669 B.R. 326, 339 (Bankr. C.D. Cal. 2025) (terminating exclusivity where the "Debtors had not made good faith progress towards reorganization and in negotiations with their creditors").

39. The Debtors filed their Chapter 11 petitions on August 2, 2026. Dkt. 1. In the weeks since, the Debtors have not filed a plan of reorganization. They have not filed a disclosure statement. They have not even circulated a term sheet or preliminary proposal to their creditors. In fact, the Debtors have not even made any progress towards obtaining access to liquidity to conduct these cases for a period of time to confirm a plan. The Debtors have only sought continued interim use of cash collateral for four week increments. [redacted]

40. The only plan-related activity that the Noteholder Group is aware of is the Debtors jettisoning their pre-filing business plans and the Debtors' statement that a new business plan is in progress. This absence of plan-related discussions is not the product of insufficient time—it is the product of Debtors that have no plan and no realistic mechanism for formulating one.

41. This case thus resembles *In re Proppant Tech Services, LLC*, No. 23-50734-MMP (Bankr. W.D. Tex. Sept. 9, 2023), where the court terminated exclusivity after approximately 100 days. There, the movant argued that the debtors were "generating negligible revenue, but burdening the Estates with excessive professional fees" and were "loading . . . these Chapter 11 Cases with unnecessary administrative expenses" while a supermajority creditor stood ready to propose a plan that would "pay all of the Debtors' creditors in full." *Mot. to Terminate Exclusivity*, Dkt. 144, ¶¶ 1, 22. The court granted the motion based on the factual and legal bases set forth therein. *Order Granting Mot. to Terminate Exclusivity*, Dkt. 230. The parallels here are exact. Without identified exit financing, without a confirmable plan structure, and without meaningful

negotiations, there is no basis to conclude that the Debtors are making progress toward any outcome other than continued depletion of the estate.

**C. Reasonable Prospects For Filing A Viable Plan—There Are None**

42. The analysis also asks "whether the debtor has demonstrated reasonable prospects for filing a viable plan." *Express One*, 194 B.R. at 100. This factor weighs decisively in favor of terminating exclusivity. Hughes has not filed a plan of reorganization, has not disclosed any terms of any plan, and has not identified any source of plan funding.

43. [redacted]

44. [redacted] Yet as of the deposition date—August 19, 2026—no formal DIP proposals had been received; no board presentations had been made regarding the need for DIP financing; and [redacted] Hughes cannot credibly claim to have "reasonable prospects for filing a viable plan."

45. A plan of reorganization cannot be confirmed unless it is feasible—the court must find that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11). The Debtors have no

exit financing. No alternative source of capital has been identified. [redacted] A plan proposed by debtors that cannot fund their operations is not a "viable" plan—it is an exercise in futility.

46. Moreover, the structural conflict—EchoStar controls the Debtors while being the target of the estate's largest claims—renders it impossible for the Debtors to propose a plan that maximizes estate value. Any plan proposed by EchoStar's controlled entity would likely include a compromise or release the very claims that represent the estate's most valuable assets. Dkt. 93 ¶¶ 4, 26–27.

47. The Noteholder Group, by contrast, has both the incentive and the capacity to propose a plan that provides for the enforcement and collection of those claims for the benefit of all creditors after emergence. The Plan described in the Plan Term Sheet does just that.

48. Specifically, the Plan addresses the very obstacles that have paralyzed the Debtors' reorganization efforts. It provides a concrete source of plan funding through a bridge debtor-in-possession loan from the Noteholder Group itself, a new senior secured asset-based revolving credit facility, and, potentially, new secured debt—eliminating the financing gap that the Debtors have been unable to fill. It resolves the structural conflict by removing EchoStar's control over the reorganization process: on the effective date of the Plan, EchoStar's equity interests in Hughes would be cancelled, a new board of directors selected by the Noteholder Group would be installed, and all causes of action against EchoStar and its insiders would be assigned to an independent litigation trust for vigorous prosecution. The Plan also maximizes estate value through a post-emergence sale process designed to close within one year of the effective date, while preserving a standalone reorganization as a fallback. The Plan Term Sheet includes defined milestones

requiring the filing of the plan of reorganization and disclosure statement within 20 days of the termination of exclusivity, approval of the disclosure statement within 40 days thereafter, and a confirmation order within 30 days of that approval. Unsecured trade creditors will likely be unimpaired, and administrative and priority claims would be satisfied in full or reinstated. In short, the Noteholder Group has proposed a plan that is not only viable but feasible—it identifies specific sources of funding, provides for the orderly disposition of the Debtors' assets, preserves estate causes of action, and sets an aggressive but achievable timeline for emergence from bankruptcy.

**D. Use Of Exclusivity As Leverage—EchoStar, Ergen, and his associates Benefit From Delay**

49. This factor asks whether the debtor is using exclusivity "to pressure creditors to submit to the debtor's reorganization demands." *Express One*, 194 B.R. at 100. This factor reflects a bedrock principle of chapter 11: exclusivity is a shield to facilitate reorganization—not a sword to coerce creditor capitulation. *See Matter of Lake in the Woods*, 10 B.R. 338, 345–46 (E.D. Mich. 1981) (exclusivity is not intended to "allow[] the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute").

50. Here, exclusivity serves the interests of EchoStar, Charles Ergen, and his associates. Every day without a plan leaves the estates' claims against EchoStar, Ergen, and his former colleagues unprosecuted while estate cash is spent on administrative expenses. On the other hand, [redacted]

[redacted]. A debtor that declines to file a plan while simultaneously preventing its supermajority creditors from doing so is not reorganizing; it is *parking*. *See In re Gen. Bearing Corp.*, 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992) (exclusivity should not be used to hold secured claimants "hostage").

51. The Debtors' conduct in blocking the Noteholder Group's access to information confirms that exclusivity is being used as leverage. On August 26, 2026, the Debtors filed an emergency motion to quash the Noteholder Group's Rule 2004 examination and document requests in their entirety (Dkt. 263), seeking to deny the holders of nearly $1.1 billion in funded debt any access to information about the estate's claims and causes of action. At a hearing that same day on the Noteholder Group's and the U.S. Trustee's motions for the appointment of an examiner (Dkts. 93, 221), EchoStar's counsel, James Bromley of Sullivan & Cromwell, stated that EchoStar would not "give everyone everything, waive privileges and simply open up all of the coffers of the company and let everyone dig through them. That's not going to happen." (Aug. 26, 2026 Hr'g Tr. at 43:1–4.) At the September 1 hearing on the motion to quash, Mr. Bromley went further, declaring that "we will fight to prevent anything from being disclosed to the Ad Hoc Group because we don't believe that they have a right to do anything at this point in time" (Sept. 1, 2026 Hr'g Tr. at 18:18–20)—and threatening that if creditors pressed for broader access, EchoStar would "exercise our rights to withdraw all access, and we're going to go to square one" (*id.* at 26:11-12). A debtor that simultaneously maintains exclusive plan-filing rights and refuses to share information with its largest creditor constituency is using exclusivity as a sword exactly as this factor prohibits.

52. The information asymmetry extends beyond outright refusal to the very structure the Debtors have established for document sharing. Notably, it is not only the Noteholder Group that has raised these concerns. The Creditors' Committee, a court-appointed fiduciary with a statutory duty to investigate estate claims, independently identified the same problem in its statement filed in response to the Debtors' motion to quash. Dkt. 283. The Creditors' Committee reported that the Debtors provided over 2 million documents to the Special Committee, yet before any of those documents can reach the Creditors' Committee, they must be screened by EchoStar's counsel, who decides "what documents should be provided to—or withheld from—the Creditors' Committee." *Id*. ¶ 3. The Creditors' Committee described this as an "unprecedented process" in which "the investigation's targets—EchoStar and Charles Ergen—are thus being provided unique access to the documents the Special Committee believes relevant to its investigation" while "EchoStar—not the Debtors—is deciding whether or not those materials should be turned over to the Creditors' Committee, and on what timeline." *Id*. ¶¶ 2, 3 The Creditors' Committee concluded that this arrangement, in which "the investigation's target acts as the gatekeeper of information to be received by the Creditors' Committee," raises "troubling questions about the Special Committee's independence." *Id.* ¶ 4.

53. The pattern is unmistakable: EchoStar maintains exclusive control over the reorganization process while simultaneously delaying creditors from obtaining the information necessary to propose or evaluate any alternative. This is precisely the use of exclusivity "to pressure creditors to submit to the debtor's reorganization demands" that this factor is designed to detect. *Express One*, 194 B.R. at 100. Where a debtor's controlling shareholder installs itself as the gatekeeper of information flowing to creditor fiduciaries, exclusivity has ceased to serve its intended purpose and has become a tool of entrenchment.

**E. Progress In Negotiations With Creditors—Zero**

54. The court also considers "whether the debtor has made progress in negotiations with its creditors." *Express One*, 194 B.R. at 100. This factor strongly favors termination. The Debtors have made no progress toward a consensual resolution with their creditors—and the record demonstrates that the fault lies squarely with the Debtors and their conflicted controlling shareholder, not with any recalcitrance on the part of the Noteholder Group.

55. In *Dow Corning*, the court found that this factor weighed against the debtor because it had been "going through the motions of negotiating a compromise, but giving up nothing in the process," and "could make a show of seeking consensus without making the slightest effort toward that end." 208 B.R. at 667. The court concluded that "the Debtor has not made sufficient progress in negotiations with the tort claimants and that it bears a good share of the blame." *Id.* at 668; *see also GMG Cap. Partners*, 503 B.R. at 601 (same where "[t]he only negotiations with [the principal creditor] have been limited to Rule 2004 discovery disputes" and the debtor "ha[d] not even commenced plan negotiations").

56. The docket in this case tells an unmistakable story: the Debtors have not engaged in any meaningful plan negotiations with their creditors. And they have stalled the commencement of mediation, which could have been an ideal forum for plan discussions. Indeed, the Special Committee's own counsel acknowledged at the August 26 hearing that "from just sitting in the back there and watching this transpire over the last month, these folks would probably be continuing to fight about the shape of the table between now and Halloween," while the Court expressed that "to the extent that we are going to have a mediator, I think we need to appoint him or appoint her sooner, rather than later" to avoid "endless litigation and endless costs." (Aug. 26,

2026 Hr'g Tr. at 44:19-22; 18:19-25.) Yet, in the time since, no real progress on mediation has happened. The parties have not even agreed on a mediator.

57. After the Petition Date, rather than engage in plan negotiations, the Debtors have devoted their energies—and scarce estate resources—to other matters. No term sheet and no concrete restructuring proposal has been placed on the table. The Debtors have instead focused on establishing a Special Committee to investigate transactions with EchoStar, an investigation conducted by directors appointed by the very insider whose conduct is at issue—Charles W. Ergen. Dkt. 4 ¶¶ 49–51. Although the Special Committee has devoted its efforts to investigating the claims against the person and entity that appointed them because they want to propose a settlement of these claims, they have not done anything to address the pressing business problems caused by the existence of inter-company relationships between Hughes and other EchoStar- and Ergen-controlled entities.

## F. Sufficient Time To Negotiate—The Debtors Have Had More Than Enough

58. The analysis of whether the Debtors have had sufficient time to negotiate a plan of reorganization also weighs decisively in favor of termination. As the Debtors' own Chief Restructuring Officer acknowledged, the Debtors engaged in prepetition negotiations "to attempt to negotiate the terms of a potential restructuring of the Debtors' funded indebtedness with [the] Ad Hoc Group." Dkt. 4 ¶¶ 14, 43. Those negotiations failed to "produce[] agreement on the terms of a consensual restructuring." *Id.* ¶ 43.

59. After the filing of their petitions, the Debtors took advantage of the deferral of personal property lease payments allowed under Bankruptcy Code section 365(d)(5) and did not budget for the payment of professional fees. This enabled the Debtors to show positive cash flow for the first eight weeks of their chapter 11 cases. [redacted]

[redacted]

Indeed there has not been any discussion at all with the Noteholder Group about how the Debtors might try to deal with this crucial problem.

60. This reveals that no amount of additional time would cure the impediments that make meaningful discussions impossible. Where such impediments render additional time futile, termination of the exclusivity period is appropriate. *See Order Terminating Exclusivity for Debtor Global Safety Textiles Holdings LLC*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG) (Bankr. D. Del. Oct. 2, 2009), Dkt. 258 (terminating exclusivity because of structural impediment of Debtor's failure to obtain unequivocal corporate authority to file and prosecute Plan). That is the case here.

61. The Debtors are controlled by EchoStar—the very entity against which the estates hold claims in excess of $1.5 billion arising from a series of value-stripping transactions. Dkt. 93, ¶¶ 2–3, 13. Two of the three members of Hughes's board of directors at the time of these transactions were officers of EchoStar. *Id.* ¶ 3. Indeed, none of the three directors, Mr. Ergen, Mr. Akhavan, and Mr. Gaske, were independent of EchoStar; all simultaneously served as officers or directors of EchoStar or its subsidiaries. Under circumstances that have yet to be investigated and are currently unclear, shortly before the commencement of these chapter 11 cases, Mr. Akhavan "resigned" from all of his roles at EchoStar and its subsidiaries, including Hughes and Mr. Gaske "retired." Mr. Ergen appointed replacements, simultaneously making clear that either or both of them can be terminated by Ergen at any time and that until their termination, the replacement directors must report their activities to the entire Hughes board, that means reporting to Mr. Ergen, the only board member not a member of the Special Committee.

62. A debtor whose controlling equity holder is also its primary litigation target cannot credibly negotiate a plan that maximizes estate value—because doing so would require the debtor to prosecute claims against its own parent. No amount of additional time or window dressing will cure this disabling conflict. The Debtors cannot simultaneously be controlled by EchoStar and negotiate a plan that holds EchoStar accountable for the more than $1.5 billion stripped from these estates.

63. Finally, the Noteholder Group and the Creditors' Committee have been trying to commence a mediation to discuss important matters in the case. The Noteholder Group's agenda included the presentation and discussion of a plan. As the Court knows, the proposal for mediation has been bogged down with disagreements over who should be the mediator, when mediation should start, and who will or will not be represented. Although the Noteholder Group would observe that the delays have been caused by the Debtors, the Special Committee and EchoStar (all parties controlled or influenced by Charles Ergen), the fact is that discussions concerning a plan have not started at all.

64. The *Dow Corning* court articulated this precise principle: "the Debtor has had sufficient time to negotiate a plan *if it and the other parties had a mind to put the wars behind them*." 208 B.R. at 665 (emphasis added). Hughes cannot "put the wars behind" it because its controlling shareholder *is* the war. The Debtors do not need more time. They need a structural change—the termination of exclusivity and the introduction of a competing plan from a creditor constituency with both the economic incentive and the independence to maximize value for the estate.

**G. Unresolved Contingency—The Absence Of Funding Is Fatal**

65. The court also considers whether an unresolved contingency exists that would justify maintaining exclusivity. *Express One*, 194 B.R. at 100. For purposes of the test, "an unresolved contingency refers to some event external to the case that must occur or not occur in order for the case to succeed." *GMG Cap. Partners*, 503 B.R. at 603. No such contingency exists here that would justify continued exclusivity.

66. To the contrary, the absence of committed exit financing is the quintessential unresolved contingency that weighs in favor of termination, not against it.

67. The *GMG Capital* court squarely addressed this issue, holding that "[i]f the financial ability to confirm a plan is the type of unresolved contingency that justifies the extension of exclusivity, debtors will be able to park themselves in chapter 11 and hold their creditors hostage unless or until things improve." 503 B.R. at 603. That is precisely what the Debtors seek to do here—maintain exclusivity indefinitely while hoping that financing materializes from an unidentified source, all while estate resources are consumed and creditor recoveries diminish.

68. The Special Committee's investigation does not constitute an unresolved contingency that justifies exclusivity. Courts have rejected the argument that pending investigations or litigation constitute the type of contingency contemplated by this factor. *See In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (rejecting argument that investigation and potential litigation constituted unresolved contingencies). The investigation, conducted by EchoStar-appointed directors investigating EchoStar's own conduct, is not an event that must occur for reorganization to succeed. It is a discretionary activity that can proceed regardless of who proposes a plan.

### H. Size And Complexity—This Is A Straightforward Bankruptcy

69. This case involves a concentrated capital structure, a linear corporate hierarchy, a limited creditor universe, and a straightforward maturity default. These are the hallmarks of an ordinary Chapter 11 case — not the exceptional complexity that justifies continued insulation from creditor plan proposals.

70. The size-and-complexity factor governing exclusivity measures *restructuring* complexity—the "difficulty in formulating a plan of reorganization"—not the dollar magnitude of a debtor's balance sheet. *In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 451 (Bankr. W.D. Tex. 1987). By that measure, this case is not complex. Counsel for the Special Committee, Patrick Nash from Kirkland & Ellis, agrees:

> From the Special Committee's perspective, Judge, we think that we should be mediating the entire case. Actually, it's not all that complicated of a situation. You might think it is, given all the Sturm [and] Drang since we filed, even before we filed. But the capital structure itself is very straightforward. The factual backdrop of how we got here and the factual backdrop of the case is probably largely agreed. The fact that there were affiliate transactions is known. The dates of those transactions is known. In most respects, the value around those, not entirely, but in many respects, the value around those affiliate transactions is known.

Sept. 3, 2026 Hr'g Tr. at 6:13-25.

71. The Debtors' non-affiliated funded debt consists of exactly two instruments issued by the same entity, guaranteed by the same subsidiaries, both already matured. Dkt. 4 ¶¶ 29-31. There is no revolving facility, no term loan, no second-lien or mezzanine layer requiring intercreditor negotiation. The only other funded obligation is $51 million in insider claims held by EchoStar XXIV LLC. Dkt. 41 at 2. Stripped to its essence, it is a dispute between two parties: the Debtors' creditors including the Noteholder Group, which holds nearly $1.1 billion of the $1.5 billion in Notes, and EchoStar, which controls the Debtors and is the target of those claims.

72. The creditor body is concentrated: the Noteholder Group holds approximately 61.6% of the Secured Notes (or 73.71% if EchoStar's $123 million insider position is excluded) and more than 84.37% of the Unsecured Notes — collectively nearly four times the funded debt held by all other creditors combined. A global resolution primarily involves four parties: the Debtors, EchoStar, the Noteholder Group, and the trade creditors—some of which are already paid in full through a generous critical vendor program that the Noteholder Group supported and continues to support. *See Nats.*, 669 B.R. at 338 (finding case "neither large nor complex" where global settlement "would primarily involve four parties" and two creditors held 85% of scheduled claims). There are no mass tort claims, no sprawling vendor litigation, no multi-jurisdictional regulatory apparatus to navigate.

73. The Debtors comprise 12 entities organized in a simple, linear corporate hierarchy. Dkt. 4-1. Hughes sits at the top as the sole issuer, eleven wholly owned subsidiaries serving as guarantors of the same funded debt. Dkt. 4 ¶¶ 27-28. This is a maturity default requiring a balance-sheet restructuring of the most elemental variety—requiring no novel plan architecture, no estimation of mass claims, and no regulatory settlements. *Cf. Gen. Bearing Corp.*, 136 B.R. at 367 (finding that, despite the debtor being an operating manufacturer with over 140 employees, "[t]his is not a complex case; there are only two secured claimholders" and "[f]inancial information as to the debtor's operations is readily available").

74. These features confirm that this case presents a straightforward balance-sheet restructuring. *See also I.M. Investments, LLC's Mot. to Terminate the Debtor's Exclusivity Period Pursuant to 11 U.S.C. § 1121 (d)*, *Proppant Tech Servs.* No. 23-50734-MMP , Dkt. 144 at 7 (seeking termination of exclusivity where restructuring turned on a single economic dispute between the debtor and a supermajority creditor); *Order Granting Mot.*, Dkt. 230 at 1-2 (granting

termination). The Noteholder Group, holding nearly four times the funded debt of all other creditors combined, is entitled to propose a competing plan. This factor weighs in favor of terminating the Debtors' exclusive period.

**I. Time Elapsed—Every Day Costs Creditors Money**

75. The final factor asks whether "the amount of time which has elapsed in the case" warrants termination of exclusivity. *Express One*, 194 B.R. at 100. The Debtors filed their voluntary Chapter 11 petitions on August 2, 2026. Dkt. 1. While only approximately 39 days have elapsed since the Petition Date, this factor does not require that the full 120-day statutory period expire before cause may be found. Courts have terminated exclusivity well before the statutory deadline. *See, e.g., Proppant Tech Servs.*, No. 23-50734-MMP, *Order Granting Mot. to Terminate the Debtor's Exclusivity Period* , Dkt. 230 at 1-2 (terminating exclusivity approximately 100 days post-petition); *Order Terminating Exclusivity for Debtor Global Safety Textiles Holdings LLC*, *Glob. Safety Textiles Holdings* , No. 09-12234 (KG), Dkt. 258 (approximately 95 days); *Order Granting Mot. to Terminate Exclusive Periods*, *In re Trigeant Holdings, Ltd.*, No. 14-29027-EPK (S.D. Fla. Dec. 15, 2014), Dkt. 255 (approximately 90 days).

76. Where the impediment to reorganization is structural rather than temporal, the passage of additional time is irrelevant. *See Expedited Mot. of the Official Committee of Unsecured Creditors to Terminate Exclusivity For Debtor Global Safety Textiles Holdings LLC*, *Glob. Safety Textiles Holdings*, No. 09-12234 (KG) , Dkt. 247 at ¶ 10 (seeking termination of exclusivity at approximately 95 days because a structural impediment, the debtor's lack of corporate authority to prosecute a plan, made additional time futile); *Order Granting Mot.*, Dkt. 258 (terminating exclusivity at approximately 95 days). That logic applies here: the structural conflict between EchoStar's control of the Debtors and the estate's claims against EchoStar cannot

be cured by the mere passage of time. Whether this Court evaluates this factor at 57 days or 120 days, the result is the same—the Debtors are structurally incapable of proposing a value-maximizing plan, and no amount of additional time will change that reality.

77. [redacted]

78. As the Eighth Circuit recognized in *Loop Corp. v. U.S. Trustee*, negative cash flow "comes straight from the pockets of the creditors." 379 F.3d 511, 516 (8th Cir. 2004). The Noteholder Group should not be required to wait until the statutory period expires—and its collateral is further diminished—when cause for termination already exists on every other factor. The Noteholder Group respectfully requests that this Court set this Motion for hearing at the earliest practicable date and that termination be effective upon entry of the Court's order.

## J. Termination Will Move This Case Forward

79. The overriding inquiry is whether termination would "facilitate moving the case forward." *Dow Corning*, 208 B.R. at 670. The answer here is unequivocal. The Noteholder Group holds a supermajority of all funded debt. It has retained PJT Partners as its financial advisor. It is prepared to propose a plan of reorganization that (a) addresses the estate's claims in excess of $1.5 billion against EchoStar; (b) identifies a viable source of plan funding; (c) provides for meaningful distributions to all creditors in accordance with the priorities of the Bankruptcy Code; and (d) moves these cases toward a resolution that the Debtors' conflicted governance structure renders them incapable of achieving on their own.

80. Congress granted exclusivity to give honest debtors breathing room to propose a plan—not to shield a conflicted parent from creditor-driven plans that would hold it accountable. *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *9 (D. Md. June 3, 2011) (terminating exclusivity to permit market testing where debtor sought to retain equity without competition). Where, as here, the debtor is structurally incapable of fulfilling the purpose for which exclusivity was granted, continued exclusivity serves only to entrench the very conflict that prevents reorganization. The Noteholder Group, which holds the overwhelming economic stake in these cases, should not be held hostage to a debtor that cannot, by reason of its own governance, propose a plan that maximizes estate value.

81. Termination does not prejudice the Debtors. The Debtors retain the concurrent right to file their own plan. *See Southwest Oil*, 84 B.R. at 454. What termination does is introduce competition—the one force capable of breaking the paralysis that has gripped these cases since its inception.

## PRAYER FOR RELIEF

WHEREFORE, the Noteholder Group respectfully requests that this Court enter the proposed order substantially in the form submitted herewith:

(1) Terminating the Debtors' exclusive periods under 11 U.S.C. § 1121(b) to allow the Noteholder Group to file plans of reorganization for some or all of the Debtors;

(2) Terminating the Debtors' exclusive period under 11 U.S.C. § 1121(c)(3) to allow the Noteholder Group to solicit acceptances of a plan or plans;

In the alternative, modifying the exclusivity periods to allow the Noteholder Group to file plans and solicit acceptances of plans.

(3) Granting such other and further relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 10, 2026

Respectfully submitted,

*/s/ Oliver S. Zeltner*

Oliver S. Zeltner (TX Bar No. 24104000)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
Email: ozeltner@jonesday.com

-and-

Bruce Bennett (CA Bar No. 105430)
(Admitted *pro hac vice*)
Joshua M. Mester (CA Bar No. 194783)
(Admitted *pro hac vice*)
Veronica Dragalin (CA Bar No. 281370)
(Admitted *pro hac vice*)
Benjamin C. Sandberg (S.D. Tex. Fed. No. 3864653)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
Email: bbennett@jonesday.com
jmester@jonesday.com
vdragalin@jonesday.com
bsandberg@jonesday.com

*Attorneys for the Noteholder Group*

**Certificate of Service**

I certify that on September 10, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Oliver S. Zeltner*
Oliver S. Zeltner